IN THE UNITED STATES DISTRICT COURT
OF THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| PRINCESS CRUISE LINES, LTD. | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil No.: 4:24-cv-00745 |
| VS | § | |
| WALLTOPIA ADVENTURE USA, LLC, | § | |
| WALLTOPIA AD, and SAFETY | § | |
| ENGINEERING OOD | § | |
| | § | |
| Defendant. | § | |
| | § | |

**DECLARATION OF IVAYLO SOTIROV IN SUPPORT OF DEFENDANTS
WALLTOPIA AD AND SAFETY ENGINEERING OOD'S MOTION TO DISMISS FOR
LACK OF PERSONAL JURISDICTION PURSUANT TO RULE 12(b)(2)**

1.      My name is Ivaylo Sotirov. I am over the age of 21 years and am fully qualified to testify to the facts contained in this declaration. The facts contained herein are within my personal knowledge unless stated otherwise, and are true and correct.

2.      I was the CEO of Walltopia Adventure USA, LLC, at the time of its formation and ran the company until its current General Manager, Yasen Nikolov, took over the operations. I am also the owner of 20% of the membership interest of Walltopia Adventure USA, LLC. I am currently the Commercial Director of Walltopia Active Entertainment, which is a division of Walltopia AD. Through my roles, I have become familiar with the operations and structure of Walltopia Adventure USA, LLC, and Walltopia AD.

3.      Safety Engineering OOD is a wholly-owned subsidiary of Walltopia AD. As the CEO of Walltopia Adventure USA, and in my role of Commercial Director of Walltopia Active Entertainment, I have worked with Safety Engineering on numerous occasions, and have gained an understanding of Safety Engineering's operations and structure.

4899-8054-6579.2

4.      Walltopia Adventure USA was originally formed in the State of Texas and remains a Texas limited liability company to this day.  Walltopia AD was formed as a Bulgarian company and remains a registered Bulgarian entity.  Safety Engineering was also formed as a Bulgarian company and remains a registered Bulgarian entity.

5.      Walltopia Adventure USA, Walltopia AD, and Safety Engineering each file separate tax returns in their respective countries.

6.      Walltopia Adventure USA maintains its own bank accounts, separate from any account owned and operated by Walltopia AD or Safety Engineering.  Walltopia AD and Safety Engineering also maintain separate bank accounts.

7.      Walltopia Adventure USA maintains certain insurance coverage for its operations. It purchases its own insurance policy with its own funds.  Walltopia AD maintains separate insurance policies, which it purchases with its own funds.  Safety Engineering also maintains separate insurance policies, which it purchases with its own funds.

8.      Each of Walltopia Adventure USA, Walltopia AD, and Safety Engineering create budgets on a regular basis.  The budget for Walltopia Adventure USA is created by Walltopia Adventure USA, and is separate from the budgets that Walltopia AD and Safety Engineering create for themselves.  Walltopia Adventure USA is responsible for determining the contents of its budget and utilizing it throughout the year.

9.      Walltopia Adventure USA also maintains its own books and accounting records, which are separate from the books and accounting records of Walltopia AD or Safety Engineering.

10.      Walltopia Adventure USA does engage in business transactions with Walltopia AD and Safety Engineering.  When Walltopia Adventure USA does so, the transactions are governed by agreements between the parties.  For example, Walltopia Adventure USA has a master

agreement for the purchase of products from Walltopia AD.  Walltopia Adventure USA also has a master agreement regarding its purchase of services and products from Safety Engineering. Those agreements require invoices to be issued for Walltopia Adventure USA's purchase of goods or services and require Walltopia Adventure USA to pay for the good or services according to the invoices.

11.    Walltopia Adventure USA maintains assets separately from the assets of any other companies.  Its assets are not commingled with the assets of Walltopia AD or Safety Engineering.

12.    Walltopia Adventure USA maintains its offices in 985 TX-121 Business, Ste 619, Lewisville, TX 75057, while Walltopia AD and Safety Engineering maintain their offices in Bulgaria.

13.    As the General Manager of Walltopia Adventure USA, Yasen Nikolov makes the decisions about Walltopia Adventure USA's daily operations.  Neither Ivaylo Penchev nor Metin Musov are the CEO of Walltopia Adventure USA.

14.    Walltopia Adventure USA has its own management, sales team, and project management.  Those employees receive compensation payments from Walltopia Adventure USA.

15.    Walltopia Adventure USA's sales team is responsible for its marketing and sales strategies, and decisions regarding those strategies are made by Walltopia Adventure USA's employees.

16.    Walltopia Adventure USA is solely responsible for determining what products and what quantities of products it orders from suppliers, including from Walltopia AD.

17.    Walltopia Adventure USA entered into two agreements with Princess Cruise Lines, Ltd—a January 27, 2023 "Design Agreement", and a June 8, 2023 "Manufacturing Agreement." A true and correct copy of the Design Agreement is attached to this declaration as Exhibit 1-A. A

true and correct copy of the Manufacturing Agreement is attached to this declaration as Exhibit 1-B.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on ___01/28/2025___

Ivaylo Sotirov

# EXHIBIT 1-A

Contract Ref. #

Project "          "

## ARCHITECTURAL DESIGN AND ENGINEERING CONTRACT

**THIS ARCHITECTURAL DESIGN AND ENGINEERING CONTRACT** ("Agreement") dated as of _____ January 27, 2023("Effective Date") is made by and between:

**WALLTOPIA ADVENTURE USA**, a LLC company organized under the laws of the State of TX, whose registered office is at 985 TX-121 Business, Ste. 619, Lewisville, TX 75057, FEIN 81-4278418 ("Designer"),

-and-

**Company Name**: Princess Cruise Lines, Ltd., a company incorporated under the laws of Bermuda, having its principal place of business at 24305 Town Center Drive, Santa Clarita, CA 91355("Client") (each referred to as a "Party" and together referred to as the "Parties")

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein, and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## I.      SCOPE OF AGREEMENT

1.1. **Scope of Agreement**. The Designer shall perform the Design Services contemplated by, inferable from, or necessary or desirable to achieve the objectives stated in the Design Scope Specification attached as Schedule A and the Contract Documents, including all design services necessary for the project to be properly constructed by a manufacturer and used, operated and maintained by Client in accordance with all Applicable Standards and otherwise in accordance with this Agreement. In addition, Designer shall familiarize itself with and review laws, codes, and regulations in place on the ship where the project will be installed and which are applicable to Designer's Services and shall be responsible for providing Services in accordance with same.

1.2. **Contract Documents**. The Contract Documents consist of the following documents (including all amendments thereto agreed upon by the Parties):

(i)      This Agreement and all schedules attached to it;

(ii)     the Design Scope Specification attached hereto as Schedule A; and

(iii)    The Design Schedule.

1.3. **Certain Definitions**. Unless the context requires otherwise, the capitalized terms used in this Agreement shall have the definitions set forth in Schedule B.

## II.      CONTRACT PRICE AND TERMS OF PAYMENT

2.1 **Contract Price**. In consideration of the provision of the Services by the Designer in accordance with the

terms of this Agreement, the Client shall pay to the Designer the sum of **144,593 EURO** ("Contract Sum") subject to additions and deductions as provided in this Agreement. The Contract Price includes all labor, costs and taxes, except such sales or value-added taxes which the Designer is required by law to collect from the Client. Such taxes, if any, shall be payable in addition to the Contract Price. The contract price of **144,593 EURO** will be deducted from the final price of the project once the client enters a manufacturing agreement with Walltopia.

2.2 **Progress Payments**. The Client shall make progress payments to the Designer on account of the Contract Price when due, together with such sales or value added taxes as may be applicable to such payment. All payment shall be made in accordance with the Payment Schedule attached hereto as Schedule C.

2.3 **Interest**. Should either Party fail to make payments as they become due under the terms of this Agreement, interest at the following rates on such unpaid amounts shall also become due and payable until payment: (1) 18% per annum for the first 30 days. (2) 21% per annum after the first 30 days. Such interest shall be compounded on a monthly basis.

2.4 **No Deduction or Set-Off**. Any amount payable by the Client to the Designer under this Agreement shall be paid without any set-off, counterclaim, deduction or withholding whatsoever.

III.    **DESIGN DEVELOPMENT STAGE**

3.1 **Design Schedule**. The Design Services shall be performed within the time frames provided by the Design Schedule attached hereto as Schedule D. Designer shall perform all Design Services as expeditiously as is consistent with professional skill and care and the orderly progress of each part of the project, as each part is set forth on the Design Scope Specification and Design Schedule, as modified from time to time in accordance with Section 3.5 relating to design change. The Design Scope Specification and Design Schedule shall include allowances for periods of time required for review by Client or other parties advising Client in matters affecting the ship and the project, and for approval of submissions by authorities having jurisdiction over the design and construction of the ship, if required.

3.2 **Client's Information**. The Client shall furnish the information required to complete the Design Services within the time frames provided by the Design Schedule, failing which the period for completion of the respective design stage shall be extended by the a period commensurate with the period of Client's delay.

3.3 **Reliance on Information**. The Designer shall be entitled to reasonably rely on the accuracy of the information represented by Client in the Design Scope Specification except for areas within the customary professional competence of a Designer working on projects of this type. Designer shall provide prompt written notice to Client if Designer becomes aware of any errors, omissions, or inconsistencies in such information. Designer shall be entitled to a reasonable, mutually agreed adjustment in the Contract Price and/or Design Schedule to the extent the Designer's cost and/or time of performance have been adversely impacted by an inaccurate information provided by Client in the Design Scope Specification. The Designer shall not be liable under this Agreement if the Design Documents do not comply with statutory requirements to the extent that such non-compliance results from the Designer having carried out the Design Services in accordance with the Contract Documents or any instruction of the Client.

3.4 **Errors or Omissions**. The Designer shall not be liable for damages or costs resulting from any error, inconsistency, or omission in the information provided by or on behalf of the Client, except as provided for in 3.3 above, or unless the Designer has explicitly undertaken in writing to review and verify the information. In such cases the time for completion of the relevant milestones shall be extended by the time reasonably required to perform the review and, if necessary, correct the information. Upon completion of the review, the Designer shall promptly notify the Client of any significant error, inconsistency, or omission discovered in the information provided by or on behalf of the Client. The Designer shall not proceed with

the Design Services affected until the Designer and the Client have agreed in writing how the information should be corrected or supplied.

**3.5** **Design Change Instructions**. The Client may issue written instructions requiring an addition to, omission from, or other change in the Design Scope Specification or the period in which the Design Services are to be carried out, including instructions that may require Designer effecting changes that necessitate an alteration or modification of the Design Documents ("Change Request"). The Designer shall notify the Client in writing, within five (5) days after receipt of the Client's amended specification, with a binding quotation concerning any adverse impact of the Change Request on the Design Schedules, costs, satisfaction of regulatory requirements, or other adverse impact that may result from the changes. The quotation thus made shall be treated as an offer by Designer to render the changed Design Services on the terms therein stated, irrevocable by Designer for a period of ten (10) business days from its receipt by Client. If Client shall accept a quotation by Designer pursuant to a Change Request within the irrevocability period, the Change Request shall constitute a change order amending the Design Scope Specification and the Design Schedule from that point forward. If Cruise Line does not accept such quotation, the Design Scope Specification and Design Schedule shall proceed unmodified as if no Change Request had been made.

3.6 **Cooperation**. The Parties    shall reasonably cooperate with one another and each shall provide the other with any information reasonably required by the other to perform hereunder    within 5 days of receipt of a written request.

3.7 **Inspection of Design Services**. The Client shall be entitled to inspect any aspect of the Design Services at any time, without causing impediment and delay to the Designer, and to require remedial actions. Any such inspection shall not reduce or otherwise affect the Designer's obligations hereunder, and the Client shall have the right to conduct further inspections after the Designer    has carried out its remedial actions.

3.8 **Initial Conceptual Design**. The Designer shall, within the prescribed time, provide to the Client (including by email or by uploading the information on www. dropbox.com or another file-sharing website) the Conceptual Design Deliverables. The Client shall communicate in writing its acceptance or rejection of the Conceptual Design Deliverables within the prescribed time. If the Client rejects the Conceptual Design Deliverables in whole or in part, the Client shall issue written instructions ("Design Change Instructions") detailing the reasons for the rejection and requiring changes, additions or modifications to the Conceptual Design Deliverables.

3.9 **Revised Conceptual Design**. Upon receipt of the Design Change Instructions issued under Section 3.8, the Designer shall revise the Conceptual Design Deliverables identified therein to address any non-conformance to the requirements of the Contract Documents and shall, within the prescribed time, provide to the Client (in the manner specified in the preceding section) a corrected version thereof for review and approval. The Client shall review the revised Conceptual Design Deliverables and shall, within the prescribed time, communicate in writing its acceptance or rejection thereof. If the Client rejects the revised Conceptual Design Deliverables in whole or in part, the Client shall issue Design Change Instructions detailing the reasons for the rejection and requiring further changes, additions or modifications to the revised Conceptual Design Deliverables. Thereafter, the procedure described in this Section 3.9 shall apply with all necessary modifications until the Designer obtains an approval of the Conceptual Design Deliverables.

3.10 **Reasons for Rejection**. For greater certainty, the Client shall be entitled to reject the Conceptual Design Deliverables (or any revision thereof) only if in the Client's reasonable opinion the Conceptual Design Deliverables    or the revision thereof, as applicable, do not conform to the requirements of Contract Documents, including the Design Scope Specification.

3.11 **Failure to Communicate Acceptance or Rejection**. If the Client fails to communicate in writing its acceptance or rejection of the Design Documents (or any revision thereof) within the prescribed time, the Designer shall not proceed with the Design Services affected until the Designer obtains the Client's written

notice of acceptance or rejection, as the case may be.

3.12 **Design Changes Following Acceptance of Design Documents**. Following the acceptance of the Conceptual Design Deliverables, the Client may continue to issue Design Change Instructions. Such Design Change Instructions shall not be processed until such time as the Parties can mutually agree in writing upon the additional cost occasioned by the issuance of the instructions. Upon reaching an agreement, the Designer shall issue a revised Design Schedule, which shall become a part of this Agreement.

## IV.    **ENGINEERING STAGE**

4.1 **Questionnaire**. Following the acceptance of the Conceptual Design Documents Deliverables , the Client shall, within the prescribed time, provide to the Designer such information as the Designer reasonably requires for the purposes of preparing the required assembly drawings, including a properly completed questionnaire containing the details of all existing or proposed facilities, systems and conditions of the proposed installation site.

4.2 **Assembly Drawings.** After receipt of the information referred to in Section 4.1 and within the prescribed time, the Designer shall prepare and, if requested, provide to the Client detailed assembly drawings for review (which shall be completed within the prescribed time). The Client's review shall not relieve the Designer of any responsibility for errors or omissions in the assembly drawings unless the Client accepts in writing a deviation from the requirements of the Contract Documents. Upon written request, the Client shall confirm in writing that the premises upon which the designed products will be located can support the loads imposed upon them, including the location of all attachment points.

4.3 **Further Review by Engineer**. The Client may upon written notice to the Designer engage a properly qualified engineer to review the assembly drawings furnished by the Designer (or any portion(s) thereof) to confirm that the same conform to the requirements of the Contract Documents and/or the applicable construction rules and regulations. In the event of non-conformity, the Designer shall correct the drawings within the prescribed time.

## V.    **REPRESENTATIONS**

5.1 **No Reliance on Representations**. Each Party acknowledges that it has not been induced to enter into this Agreement by any representation, warranty or undertaking not expressly incorporated herein.

5.2 **Reasonable Skill and Care.** The Designer agrees that, at all times in performing its obligations set out in this Agreement, it shall:

(a)   do so in accordance with all due skill, competence, care, diligence, prudence and foresight to be expected of appropriately qualified and experienced professional designers, with experience in carrying out work of a similar scope, type, nature and complexity to that required under this Agreement;

(b)   comply in all respects with the Applicable Standards;

(c) provide Design Services and Deliverables that do not infringe upon the intellectual property rights of any third party.

## VI.    **DEFAULT AND REMEDIES**

6.1 **Default by Client.** The following shall constitute acts of default by the Client under this Agreement:

    (a)  the Client wrongfully rejects any Deliverables provided under this Agreement;

    (b)  the Client defaults in the payment of any amount owed to the Designer, and remains in default for a period of 10 (ten) Business Days of receipt of a notice to cure from the Designer;

    (c)  the Client otherwise fails to observe or perform any material obligation under this Agreement within 10 (ten) Business Days after receipt of a notice to cure from the Designer;

    (d)  the Client is adjudged bankrupt or becomes insolvent or overindebted, or a petition in bankruptcy is filed against the Client or where the Client files an assignment in bankruptcy or where any proceedings are instituted in any jurisdiction in respect of the alleged insolvency, over-indebtedness or bankruptcy of the Client.

6.2 **Designer's Remedies**. If the Client defaults under this Agreement, the Designer may exercise one or more of the following rights:

    (a)  suspend the provision of the Design Services;

    (b)  accelerate its right to receive payment of the full unpaid balance of the Contract Price and all interest accrued or accruing due during the term of that interest period, and;

    (c)  terminate this Agreement;

    (d)  recover all damages arising from the Client's default;

6.3 **Default by Designer**. The following shall constitute acts of default by the Designer under this Agreement:

    (a)  the Designer materially breaches this Agreement and such breach remains uncured for ten (10) Business Days following written notice of breach by the Client;

    (b)  the Designer is adjudged bankrupt or becomes insolvent or overindebted, or a petition in bankruptcy is filed against Designer or where the Designer files an assignment in bankruptcy or where any proceedings are instituted in any jurisdiction in respect of the alleged insolvency, over-indebtedness or bankruptcy of Designer.

If (a) or (b) above occur, Client may terminate this Agreement with immediate effect by giving written notice to the Designer and pursue all available remedies at law or in equity.

6.4  **Termination for Convenience by Client.** This Agreement may be terminated for convenience by Client at any time, by written notice to Designer. In the case of a total termination, Client shall be liable for a percentage of any fixed fees equal to the percentage of the total Design Services performed under this Agreement to the time of termination, plus ten percent (10%) of the difference between the total fixed fees and such percentage. In such case, Client shall also compensate Designer for any reasonable, documented expenses associated with the termination of overhead, employment or engagement of employees, or subcontractors hired or engaged by Designer in reasonable reliance on the continuation of this Agreement. Termination payments under this Section 6.4 shall be in lieu of any other payments owed by Client to Designer.

6.5 **Consequences of Termination.** In the event of a termination of this Agreement by either Party, whether or not for cause, Designer shall cooperate with Client in promptly transferring to Client all Deliverables and working papers then in the possession of Designer that are necessary or convenient to the completion of the Design Services by Client, another designer, or similar contractor. Client shall promptly reimburse Designer for any out-of-pocket costs incurred by Designer in duplicating or transferring all such Deliverables and underlying working papers.

6.6 **Limitation of Liability**. The Designer shall not be liable under this Agreement if the Deliverables do not comply with the Contract Documents to the extent such non-compliance results from the Designer complying with any written instruction of the Client in accordance with Section 3.3 and elsewhere herein. Except as otherwise specified herein, and except in the case of willful or intentional acts or omissions of Designer, in no event shall the liability of the Designer under this Agreement exceed the amount paid by the Client hereunder.

6.7 **Consequences of Failure to Pay When Due.** Notwithstanding anything to the contrary contained herein, if the Client fails to make payments as they become due under the terms of this Agreement, the time for completion of Design Services shall be extended by the period(s) of time during which the Client is in default.

6.8 **Remedies Not Exclusive**. Except as expressly provided otherwise, the remedies available hereunder shall be in addition to and not a limitation of the remedies otherwise available by law or in equity.

6.9 **Force Majeure**. If a Party is delayed in the performance of the Agreement by labor disputes, strikes, lock-outs, fire, unusual delay by common carriers, abnormally adverse weather conditions, pandemic, public health emergency, or any cause beyond a Party's reasonable control other its default or breach of the Agreement, then the time for performance of the Agreement shall be extended for such time as agreed between the Parties that is commensurate with the delay. The extension of time shall not be less than the time lost as the result of the event causing the delay, unless the delayed Party agrees to a shorter extension. The delayed Party shall not be entitled to payment for costs incurred by such delay unless such delay results from actions of the other Party, or any of its employees, agents or contractors. No extension shall be made for delay unless the delayed Party notifies the other Party of the cause of delay within than 10 Business Days after the commencement of the delay.

## VII.   **OTHER PROVISIONS**

7.1 **Intellectual Property Rights**. All Intellectual Property Rights, including, but not limited to, all copyright in the Deliverables, design (including computer generated designs), drawings (including, but not limited to, plans, sketches, graphic representations, and specifications) and electronic media (collectively, the "Drawings"), prepared by or on behalf of the Designer for Client belongs to the Client and shall be deemed "Works for Hire" as defined under all applicable laws, and that if any of the Deliverables, Drawings or Intellectual Property contained therein is determined not to be a "Work for Hire" that the Designer hereby irrevocably assigns all rights in such to the Client without compensation to Designer and will execute any and all documents necessary to effectuate the foregoing assignment. Designer waives any "moral rights" in and to the Deliverables and Drawings. Notwithstanding the foregoing, to the extent the Deliverables or Drawings contain any of Designer's pre-existing intellectual property ("Designer Property), Designer shall retain ownership and proprietary rights in same and shall provide Client with a perpetual, royalty-free, transferable, world-wide right and license, including the right to sublicense, to use the Designer Property.

7.2 **Indemnification for Intellectual Property Breaches.** Designer ("Indemnitor") shall indemnify, defend (through mutually agreeable counsel), and hold harmless Client and any affected parent or affiliate company and their respective shareholders, directors, officers, employees and agents (collectively "Indemnitee"), from and against any third party claims, liabilities, suits, demands, judgments, losses, damages and expenses (including legal fees and expenses to enforce the rights of Indemnitee hereunder) for; i) infringement of any intellectual property or ownership right arising out of or attributable to the Services, Drawings or a Deliverable; ii) Designer's breach of this Agreement; iii) Designer's negligent or willful acts or omissions. The foregoing indemnification obligations shall survive the expiration or earlier

termination of this Agreement and any limitation of liability contained herein shall not be construed to limit the scope of Indemnitor's indemnification obligations.

7.3  **Confidentiality.** Unless otherwise agreed to in writing by the Parties or required by law, the Parties (including their employees, agents, and subcontractors) shall keep confidential all matters respecting technical and commercial issues relating to or arising from the performance of this Agreement ("Confidential Information") and shall not, without the prior written consent of the other Party, disclose any such matters, except in strict confidence, to their respective professional advisors or financiers (who shall agree not to disclose the same). The receiving Party shall protect all Confidential Information with at least the same degree of care as it normally exercises to protect its own confidential information of a similar nature, but with no less than a reasonable degree of care. The Parties shall limit reproductions of Confidential Information to the minimum required for the proper performance of the services to be rendered under this Agreement and shall restrict disclosure of such information to its employees or contractors who have a need to know such information and who are bound legally by obligations of confidentiality. Notwithstanding the foregoing, Confidential Information shall not include information which (i) is generally available to the public prior to the date of this Agreement, becomes generally available to the public after the date of this Agreement through no fault of the receiving Party or was known by the receiving Party prior to the time it first became involved in the discussion of this project, (ii) becomes available to the receiving Party on a non-confidential basis from a third party source, *provided that* such third party source is not bound, directly or indirectly, by a confidentiality obligation to the disclosing Party, (iii) is independently developed by the receiving Party without use or reference to the disclosing Party's confidential information, (iv) is disclosed to an affiliate of the receiving Party, or (v) the disclosing Party agrees in writing is free of such restrictions. The receiving Party agrees that in the event that it or anyone to whom it supplies Confidential Information is requested and required (by oral questions, interrogatories, requests for information or documents, subpoenas, warrants, civil investigative demands or similar process) to disclose any Confidential Information, it shall promptly notify the disclosing Party by means calculated to give the disclosing Party the maximum possible opportunity to seek an appropriate protective order or otherwise seek to protect the confidentiality of the requested information to the extent it sees fit. The disclosure of Confidential Information compelled by law shall not result in releasing the Parties from any obligation of confidentiality with respect to the matters so disclosed. At the conclusion of the term of this Agreement, or earlier upon request, Designer shall return to Client all Confidential Information of Client and any Client property in Designer's possession or control. Any limitation of liability contained in this Agreement shall not apply to a breach by a Party of its confidentiality obligations herein.

7.4  **Assignment**. Neither Party shall assign or transfer or otherwise dispose of its rights and/or obligations under this Agreement without the prior written consent of the other Party, except that Client may assign this Agreement to its parent, subsidiary or affiliate company without consent.

7.5  **Notices**. All notices relating to this Agreement shall be in writing and shall be addressed to the recipient at the address set out below:

>  If to the Designer:
>
>  **Company:** Walltopia Adventure USA, LLC
>
>  **Attention:** Ivaylo Sotirov
>
>  **Address:** 1620 TX-121 BUSINESS, BLDG C, STE 900, LEWISVILLE, TX 75056
>
>  **Email:** ivaylo.sotirov@walltopia.com
>
>  **Phone Number:** 916-293-1706
>
>
>  If to the Client:

**Company:** Princess Cruise Lines, Ltd.

**Attention:** James Kent

**Address:** 24305 Town Center Drive, Santa Clarita, CA 91355

**E-mail:** jakent@hagroup.com

**Phone Number:** 818-472-0926_____

7.5 <u>**Date of Receipt**</u>. All notices shall be delivered by hand, by courier, by email or other form of electronic communication which allows for indication of failure of transmittal   to be communicated to the sender. A notice delivered by one Party shall be deemed to have been received by the other Party on the date of delivery if delivered by hand or courier or email, provided that if such day is not a Business Day, then the notice shall be deemed to have been received on the Business Day next following such day.

7.6. <u>**Change of Address for Correspondence**</u>. An address for a Party may be changed by delivering a written notice to the other Party in accordance with the provisions of the preceding section.

7.7. <u>**Waivers**</u>. No action or failure to act by the Designer or the Client shall constitute a waiver of any right or duty afforded to that Party under this Agreement, nor shall any such action or failure to act constitute an approval of or acquiescence in any breach thereunder, except as may be specifically agreed to in writing.

**7.8.  <u>Effect of Partial Invalidity</u>**. If at any time any one or more of the provisions of this Agreement becomes invalid, illegal or unenforceable in any respect under any law, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired

7.9.  <u>**Governing Law**</u>. This Agreement shall be governed by the laws of state of Texas, without reference to its conflict of laws provisions.

7.10 <u>**Jurisdiction**</u>. The Parties agree that the Texas courts shall have exclusive jurisdiction for the purpose of hearing and determining any suit, action or proceedings and/or to settle any disputes arising out of or in any way relating to this Agreement or its formation or validity.

7.11 **Independent Contractor**. It is expressly understood that Designer is engaged in an independent business and will perform its obligations under this Agreement as an independent contractor and not as an agent, employee, partner, or joint employer of Client or be in any other relationship with Client other than that of an independent contractor.

7.12 <u>**Ethical Standards & Anti-Bribery.**</u>  Designer represents and warrants that it is in compliance with and shall continue to comply with all applicable laws, regulations, codes and sanctions relating to anti-bribery and anti-corruption, including, but not limited to, the UK Bribery Act 2010, the U.S. Foreign Corrupt Practices Act of 1977, as amended, and any other similar federal or state laws, if applicable.  Each Party acknowledges that government regulations and laws restrict the ability to offer services or engage in financial transactions with persons from certain countries or persons included in Specially Designated Nationals lists ("**SDN lists**") as published by the U.S. Office of Foreign Assets Control ("**OFAC**"). Designer represents and warrants that neither Designer nor any of Designer's personnel involved in performing Design Services or otherwise having access to Client's Confidential Information pursuant to this Agreement, are included in OFAC's SDN lists or are subject to country based OFAC sanctions.  The representations contained in this section shall be ongoing, and Designer shall promptly notify Client if it becomes aware of any indication that Designer or any of Designer's personnel appear on any such list or are subject to any such sanctions described in the foregoing of this section.  Designer shall, and shall cause Designer's personnel to comply with Client's "Business Partner Code of Conduct and Ethics" (available at https://www.carnivalcorp.com/governance/business-conduct-ethics in the "Links" section).  In addition, with respect to Designer's rights and obligations under this Agreement including any past or future relationship with Client and any interaction with any employee

of Client, Designer shall not, and shall cause its personnel not to (i) give or offer to give any gift or benefit to any Client employee, (ii) solicit or accept any services, equipment or commitment, or confidential or proprietary information or data from any Client employee unless such employee is (a) required under a contract between Designer and Client, (b) made pursuant to a written disclosure agreement between Client and Designer, or (c) specifically authorized in writing by Client's management, (iii) solicit or accept favoritism from any Client employee, (iv) use any information it receives in connection with its business dealings with Client to sell purchase or trade any stock, security or derivative thereof of Client or Client's parent or affiliated companies, (v) enter into any outside business relationship with any Client employee without full disclosure to, and prior approval of, Client's management.  As used herein, "employee" includes members of employee's immediate family and household, "gift or benefit" includes money, goods, services, discounts, favors and the like in any form, but excludes low value advertising items, such as pens, pencils and calendars, and "favoritism" means partiality in promoting the interest of Designer over that of other suppliers.  Notwithstanding anything to the contrary contained herein, in the event of any conflict between the terms and conditions of this Agreement and the Business Partner Code of Conduct and Ethics, the terms of the Business Partner Code of Conduct and Ethics will control.

7.11  **Entire Agreement**. This Agreement supersedes all prior or contemporaneous negotiations, representations or agreements, either written or oral, including bidding documents that are not expressly incorporated herein, and shall not be varied otherwise than by an instrument of even date herewith or subsequent hereto executed by or on behalf of the Parties.

7.12 **Counterparts**. This Agreement may be executed in any number of counterparts, and by each Party on separate counterparts. Each counterpart is an original, but all counterparts shall together constitute one and the same instrument.

**IN WITNESS WHEREOF** each of the Parties hereto has signed this Agreement as of the date first written above.

**[SIGNATURES APPEAR ON THE FOLLOWING PAGE]**

**WALLTOPIA ADVENTURE USA, LLC:**          **PRINCESS   CRUISE   LINES,   LTD.**

By: _____               By: _____

Name: _____               Name: _____

Title: CEO                                 Title: Sr. Director New Builds

Date: _____               Date: 27 January 2023

## SCHEDULE A

## DESIGN SCOPE SPECIFICATION

Design and Engineering of an Adventure Activity Center on the upper decks of Project Sphere (Fincantieri HULL 6310 & HULL 6311).   The Adventure Activity Center is to consist of the following elements:

1.  "Rollglider" attraction, including all necessary columns, structural supports, track, and other items necessary to provide a functional attraction.
2.  Functional design of the Rollglider boarding/deboarding station, including the support facilities for the powered Rollglider units.
3.  Two-level (higher difficulty + lower difficulty) Ropes Course attraction, including access stair with integrated belay channel.
4.  Climbing Structure & Obstacle Course, including integrated dry slides and all relevant netted enclosures.

These elements are to be designed in accordance with the general layout, complexity, and features shown in the *Activity Zone A0 Preliminary* drawing, *A1-0915-ZON-10-Floor Plan* drawing, *A-0915-ZON-10-Section-Section 1* drawing, and the Jack Rouse Associates Project Sphere Activity Zone presentation dated 13 March 2021.

In addition to the Applicable Standards, the design is to determine or account for the following:

- Vortex shedding check to avoid resonance of the roll glider structure due to this phenomenon.
- Loads due to thermal effects (specified temperature range) of expansion contraction.
- Loads due to ship hull deflection (hogging/ sagging).
- Definition of the limiting wind speeds and ship motions for safe operation of the various features (as opposed to the absolute extreme weather design limits)

**SCHEDULE B**

**CERTAIN DEFINITIONS**

 "Applicable Standards" means:

    i.    EN12572-1:2007 (Artificial climbing structures - Part 1: Safety requirements and test methods for ACW with protection points;

    ii.    EN12572-2:2008 (Artificial climbing structures - Part 2: Safety requirements and test methods for bouldering walls);

    iii.    EN1991-1-1:2002 (Actions on structures - Part 1-1: General actions - Densities, self-weight, imposed loads for buildings);

    iv.    EN1991-1-3:2002 (Actions on structures - Part 1-3: General actions - Snow loads); and

    v.    EN1991-1-4:2002 (Actions on structures - Part 1-4: General actions - Wind actions).

    vi.    EN13814:2019 (Safety of amusement rides and amusement devices

    vii.    Fincantieri document "Roller Glide – Design Criteria for Steel Structures

    viii.    Fincantieri document "Vibration Prescriptions for Dynamic Analysis"

    ix.    Lloyd's Register Rules and Regulations for the Classification of Ships, where design criteria are shown to be more conservative than the criteria in the EN standards.

"Business Day" means any day other than a Saturday, Sunday, statutory holiday that is observed in the Republic of Bulgaria.

"Deliverables" means the deliverables identified on the Table of Milestones.

"Design Services" means the conceptual design and engineering services to be provided by the Designer under this Agreement and all labor, materials, supervision, equipment, computers, documents, and all other things necessary for the performance of such services, including and by way of example, not limitation, any and all visual designs, visual elements, graphic design, illustration, animation, and text.

"Payment Schedule" means the plan for payment of the Contract Price as set out in Schedule C.

"prescribed time" means the time for completion of the relevant stage specified in the Design Schedule (as extended in accordance with this Agreement), or if such time is not specified therein, the time reasonably required to complete the relevant milestone.

## SCHEDULE C

## PAYMENT SCHEDULE

Set out the relevant details.

The Contract Price shall be paid as follows:

(a)   the amount of **144,593 EURO** shall be due and payable within 30 Business Days from the signing of this Agreement.

## SCHEDULE D

## DESIGN SCHDULE

30 Calendar Days from the date of signing this agreement.

# EXHIBIT 1-B

- 1 -

Project: Princess Sphere Activity Zone

**SUN PRINCESS (H.6310) ACTIVITY ELEMENTS MANUFACTURING & SUPPLY CONTRACT**

**THIS MANUFACTURING & SUPPLY CONTRACT** ("Agreement") dated as of June 8, 2023("Effective Date") is made by and between:

**WALLTOPIA ADVENTURE USA**, a LLC company organized under the laws of the State of TX, whose registered office is at 985 TX-121 Business, Ste. 619, Lewisville, TX 75057, FEIN 81-4278418 ("Supplier"),

-and-

**Company Name**: Princess Cruise Lines, Ltd., a company incorporated under the laws of Bermuda, having its principal place of business at 24305 Town Center Drive, Santa Clarita, CA 91355("Client") (each referred to as a "Party" and together referred to as the "Parties")

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein, and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

<h2 style="text-align:center">I.       SCOPE OF AGREEMENT</h2>

1.1. **Scope of Agreement**. The Supplier shall perform the Services contemplated by, inferable from, or necessary or desirable to achieve the objectives stated in the Specification attached as Schedule A and the Contract Documents, including all services necessary for the project to be properly constructed by the Supplier and used, operated and maintained by Client in accordance with all Applicable Standards and otherwise in accordance with this Agreement. In addition, Supplier shall familiarize itself with and review laws, codes, and regulations in place on the ship where the project will be installed and which are applicable to Supplier's Services and shall be responsible for providing Services in accordance with same.

1.2. **Contract Documents**. The Contract Documents consist of the following documents (including all amendments thereto agreed upon by the Parties):

(i)     This Agreement and all schedules attached to it;

(ii)    Scope of Supply, including the listed Terms & Conditions, attached hereto as Schedule A;

(iii)   The supply schedule, attached hereto as Schedule D; and

(iv)   The design developed and agreed under the previous Design and Engineering Agreement between Client and Supplier.

1.3. **Certain Definitions**. Unless the context requires otherwise, the capitalized terms used in this Agreement shall have the definitions set forth in Schedule B.

<h2 style="text-align:center">II.       CONTRACT PRICE AND TERMS OF PAYMENT</h2>

2.1 **Contract Price**. In consideration of the provision of the Services by the Supplier in accordance with the

terms of this Agreement, the Client shall pay to the Supplier the sum of **1,432,613 USD** ("Contract Sum") subject to additions and deductions as provided in this Agreement. The Contract Price includes all labor, costs and taxes, except such sales or value-added taxes which the Supplier is required by law to collect from the Client. Such taxes, if any, shall be payable in addition to the Contract Price.

2.2 **Progress Payments**. The Client shall make progress payments to the Supplier on account of the Contract Price when due, together with such sales or value added taxes as may be applicable to such payment. All payment shall be made in accordance with the Payment Schedule attached hereto as <u>Schedule C</u>.

2.3 **Interest.** Should either Party fail to make payments as they become due under the terms of this Agreement, interest at the following rates on such unpaid amounts shall also become due and payable until payment: (1) 18% per annum for the first 30 days. (2) 21% per annum after the first 30 days. Such interest shall be compounded on a monthly basis.

2.4 **No Deduction or Set-Off.** Any amount payable by the Client to the Supplier under this Agreement shall be paid without any set-off, counterclaim, deduction or withholding whatsoever.

## III.     **REPRESENTATIONS**

5.1 **No Reliance on Representations**. Each Party acknowledges that it has not been induced to enter into this Agreement by any representation, warranty or undertaking not expressly incorporated herein.

5.2 **Reasonable Skill and Care.** The Supplier agrees that, at all times in performing its obligations set out in this Agreement, it shall:

(a)  do so in accordance with all due skill, competence, care, diligence, prudence and foresight to be expected of appropriately qualified and experienced professional Suppliers, with experience in carrying out work of a similar scope, type, nature and complexity to that required under this Agreement;

(b)  comply in all respects with the Applicable Standards;

(c) provide Services and Deliverables that do not infringe upon the intellectual property rights of any third party.

## IV.     **DEFAULT AND REMEDIES**

6.1 **Default by Client.** The following shall constitute acts of default by the Client under this Agreement:

(a) the Client wrongfully rejects any Deliverables provided under this Agreement;

(b) the Client defaults in the payment of any amount owed to the Supplier, and remains in default for a period of 10 (ten) Business Days of receipt of a notice to cure from the Supplier;

(c) the Client otherwise fails to observe or perform any material obligation under this Agreement within 10 (ten) Business Days after receipt of a notice to cure from the Supplier;

(d) the Client is adjudged bankrupt or becomes insolvent or overindebted, or a petition in bankruptcy is filed against the Client or where the Client files an assignment in bankruptcy or where any proceedings are instituted in any jurisdiction in respect of the alleged insolvency, over-indebtedness or bankruptcy of the Client.

6.2 **Supplier's Remedies**. If the Client defaults under this Agreement, the Supplier may exercise one or more

- 3 -

of the following rights:

(a)  suspend the provision of the Services;

(b)  accelerate its right to receive payment of the full unpaid balance of the Contract Price and all interest accrued or accruing due during the term of that interest period, and;

(c)  terminate this Agreement;

(d)  recover all damages arising from the Client's default;

6.3  **Default by Supplier**. The following shall constitute acts of default by the Supplier under this Agreement:

(a)  the Supplier materially breaches this Agreement and such breach remains uncured for ten (10) Business Days following written notice of breach by the Client;

(b)  the Supplier is adjudged bankrupt or becomes insolvent or overindebted, or a petition in bankruptcy is filed against Supplier or where the Supplier files an assignment in bankruptcy or where any proceedings are instituted in any jurisdiction in respect of the alleged insolvency, over-indebtedness or bankruptcy of Supplier.

If (a) or (b) above occur, Client may terminate this Agreement with immediate effect by giving written notice to the Supplier and pursue all available remedies at law or in equity.

6.4  **Termination for Convenience by Client.** This Agreement may be terminated for convenience by Client at any time, by written notice to Supplier. In the case of a total termination, Client shall be liable for a percentage of any fixed fees equal to the percentage of the total Design Services performed under this Agreement to the time of termination, plus ten percent (10%) of the difference between the total fixed fees and such percentage. In such case, Client shall also compensate Supplier for any reasonable, documented expenses associated with the termination of overhead, employment or engagement of employees, or subcontractors hired or engaged by Supplier in reasonable reliance on the continuation of this Agreement. Termination payments under this Section 6.4 shall be in lieu of any other payments owed by Client to Supplier.

6.5  **Consequences of Termination.** In the event of a termination of this Agreement by either Party, whether or not for cause, Supplier shall cooperate with Client in promptly transferring to Client all Deliverables and working papers then in the possession of Supplier that are necessary or convenient to the completion of the Design Services by Client, another Supplier, or similar contractor. Client shall promptly reimburse Supplier for any out-of-pocket costs incurred by Supplier in duplicating or transferring all such Deliverables and underlying working papers.

6.6  **Limitation of Liability**. The Supplier shall not be liable under this Agreement if the Deliverables do not comply with the Contract Documents to the extent such non-compliance results from the Supplier complying with any written instruction of the Client in accordance with Section 3.3 and elsewhere herein. Except as otherwise specified herein, and except in the case of willful or intentional acts or omissions of Supplier, in no event shall the liability of the Supplier under this Agreement exceed the amount paid by the Client hereunder.

6.7  **Consequences of Failure to Pay When Due.** Notwithstanding anything to the contrary contained herein, if the Client fails to make payments as they become due under the terms of this Agreement, the time for completion of Design Services shall be extended by the period(s) of time during which the Client is in default.

6.8  **Remedies Not Exclusive**. Except as expressly provided otherwise, the remedies available hereunder shall be in addition to and not a limitation of the remedies otherwise available by law or in equity.

6.9 **Force Majeure**. If a Party is delayed in the performance of the Agreement by labor disputes, strikes, lock-outs, fire, unusual delay by common carriers, abnormally adverse weather conditions, pandemic, public health emergency, or any cause beyond a Party's reasonable control other its default or breach of the Agreement, then the time for performance of the Agreement shall be extended for such time as agreed between the Parties that is commensurate with the delay. The extension of time shall not be less than the time lost as the result of the event causing the delay, unless the delayed Party agrees to a shorter extension. The delayed Party shall not be entitled to payment for costs incurred by such delay unless such delay results from actions of the other Party, or any of its employees, agents or contractors. No extension shall be made for delay unless the delayed Party notifies the other Party of the cause of delay within than 10 Business Days after the commencement of the delay.

## V.   **OTHER PROVISIONS**

7.1 **Intellectual Property Rights**. All Intellectual Property Rights, including, but not limited to, all copyright in the Deliverables, design (including computer generated designs), drawings (including, but not limited to, plans, sketches, graphic representations, and specifications) and electronic media (collectively, the "Drawings"), prepared by or on behalf of the Supplier for Client belongs to the Client and shall be deemed "Works for Hire" as defined under all applicable laws, and that if any of the Deliverables, Drawings or Intellectual Property contained therein is determined not to be a "Work for Hire" that the Supplier hereby irrevocably assigns all rights in such to the Client without compensation to Supplier and will execute any and all documents necessary to effectuate the foregoing assignment. Supplier waives any "moral rights" in and to the Deliverables and Drawings. Notwithstanding the foregoing, to the extent the Deliverables or Drawings contain any of Supplier's pre-existing intellectual property ("Supplier Property"), Supplier shall retain ownership and proprietary rights in same and shall provide Client with a perpetual, royalty-free, transferable, world-wide right and license, including the right to sublicense, to use the Supplier Property.

7.2 **Indemnification for Intellectual Property Breaches.** Supplier ("Indemnitor") shall indemnify, defend (through mutually agreeable counsel), and hold harmless Client and any affected parent or affiliate company and their respective shareholders, directors, officers, employees and agents (collectively "Indemnitee"), from and against any third party claims, liabilities, suits, demands, judgments, losses, damages and expenses (including legal fees and expenses to enforce the rights of Indemnitee hereunder) for; i) infringement of any intellectual property or ownership right arising out of or attributable to the Services, Drawings or a Deliverable; ii) Supplier's breach of this Agreement; iii) Supplier's negligent or willful acts or omissions. The foregoing indemnification obligations shall survive the expiration or earlier termination of this Agreement and any limitation of liability contained herein shall not be construed to limit the scope of Indemnitor's indemnification obligations.

7.3 **Confidentiality.** Unless otherwise agreed to in writing by the Parties or required by law, the Parties (including their employees, agents, and subcontractors) shall keep confidential all matters respecting technical and commercial issues relating to or arising from the performance of this Agreement ("Confidential Information") and shall not, without the prior written consent of the other Party, disclose any such matters, except in strict confidence, to their respective professional advisors or financiers (who shall agree not to disclose the same). The receiving Party shall protect all Confidential Information with at least the same degree of care as it normally exercises to protect its own confidential information of a similar nature, but with no less than a reasonable degree of care. The Parties shall limit reproductions of Confidential Information to the minimum required for the proper performance of the services to be rendered under this Agreement and shall restrict disclosure of such information to its employees or contractors who have a need to know such information and who are bound legally by obligations of confidentiality. Notwithstanding the foregoing, Confidential Information shall not include information which (i) is generally available to the public prior to the date of this Agreement, becomes generally available to the public after the date of this Agreement through no fault of the receiving Party or

- 5 -

was known by the receiving Party prior to the time it first became involved in the discussion of this project, (ii) becomes available to the receiving Party on a non-confidential basis from a third party source, *provided that* such third party source is not bound, directly or indirectly, by a confidentiality obligation to the disclosing Party, (iii) is independently developed by the receiving Party without use or reference to the disclosing Party's confidential information, (iv) is disclosed to an affiliate of the receiving Party, or (v) the disclosing Party agrees in writing is free of such restrictions. The receiving Party agrees that in the event that it or anyone to whom it supplies Confidential Information is requested and required (by oral questions, interrogatories, requests for information or documents, subpoenas, warrants, civil investigative demands or similar process) to disclose any Confidential Information, it shall promptly notify the disclosing Party by means calculated to give the disclosing Party the maximum possible opportunity to seek an appropriate protective order or otherwise seek to protect the confidentiality of the requested information to the extent it sees fit. The disclosure of Confidential Information compelled by law shall not result in releasing the Parties from any obligation of confidentiality with respect to the matters so disclosed. At the conclusion of the term of this Agreement, or earlier upon request, Supplier shall return to Client all Confidential Information of Client and any Client property in Supplier's possession or control. Any limitation of liability contained in this Agreement shall not apply to a breach by a Party of its confidentiality obligations herein.

7.4 **Assignment**. Neither Party shall assign or transfer or otherwise dispose of its rights and/or obligations under this Agreement without the prior written consent of the other Party, except that Client may assign this Agreement to its parent, subsidiary or affiliate company without consent.

7.5 **Notices**. All notices relating to this Agreement shall be in writing and shall be addressed to the recipient at the address set out below:

> If to the Supplier:
>
> **Company:** Walltopia Adventure USA, LLC
>
> **Attention:** Ivaylo Sotirov
>
> **Address:** 1620 TX-121 BUSINESS, BLDG C, STE 900, LEWISVILLE, TX 75056
>
> **Email:** ivaylo.sotirov@walltopia.com
>
> **Phone Number:** 916-293-1706
>
>
> If to the Client:
>
> **Company:** Princess Cruise Lines, Ltd.
>
> **Attention:** James Kent
>
> **Address:** 24305 Town Center Drive, Santa Clarita, CA 91355
>
> **E-mail:** jakent@hagroup.com
>
> **Phone Number:** 818-472-0926

7.5 **Date of Receipt**. All notices shall be delivered by hand, by courier, by email or other form of electronic communication which allows for indication of failure of transmittal to be communicated to the sender. A notice delivered by one Party shall be deemed to have been received by the other Party on the date of delivery if delivered by hand or courier or email, provided that if such day is not a Business Day, then the notice shall be deemed to have been received on the Business Day next following such day.

7.6. **Change of Address for Correspondence**. An address for a Party may be changed by delivering a written notice to the other Party in accordance with the provisions of the preceding section.

7.7. **Waivers**. No action or failure to act by the Supplier or the Client shall constitute a waiver of any right or duty afforded to that Party under this Agreement, nor shall any such action or failure to act constitute an approval of or acquiescence in any breach thereunder, except as may be specifically agreed to in writing.

**7.8. Effect of Partial Invalidity**. If at any time any one or more of the provisions of this Agreement becomes invalid, illegal or unenforceable in any respect under any law, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired

7.9. **Governing Law**. This Agreement shall be governed by the laws of state of Texas, without reference to its conflict of laws provisions.

7.10 **Jurisdiction**. The Parties agree that the Texas courts shall have exclusive jurisdiction for the purpose of hearing and determining any suit, action or proceedings and/or to settle any disputes arising out of or in any way relating to this Agreement or its formation or validity.

7.11 **Independent Contractor**. It is expressly understood that Supplier is engaged in an independent business and will perform its obligations under this Agreement as an independent contractor and not as an agent, employee, partner, or joint employer of Client or be in any other relationship with Client other than that of an independent contractor.

7.12 **Ethical Standards & Anti-Bribery**. Supplier represents and warrants that it is in compliance with and shall continue to comply with all applicable laws, regulations, codes and sanctions relating to anti-bribery and anti-corruption, including, but not limited to, the UK Bribery Act 2010, the U.S. Foreign Corrupt Practices Act of 1977, as amended, and any other similar federal or state laws, if applicable. Each Party acknowledges that government regulations and laws restrict the ability to offer services or engage in financial transactions with persons from certain countries or persons included in Specially Designated Nationals lists ("**SDN lists**") as published by the U.S. Office of Foreign Assets Control ("**OFAC**"). Supplier represents and warrants that neither Supplier nor any of Supplier's personnel involved in performing Design Services or otherwise having access to Client's Confidential Information pursuant to this Agreement, are included in OFAC's SDN lists or are subject to country based OFAC sanctions. The representations contained in this section shall be ongoing, and Supplier shall promptly notify Client if it becomes aware of any indication that Supplier or any of Supplier's personnel appear on any such list or are subject to any such sanctions described in the foregoing of this section. Supplier shall, and shall cause Supplier's personnel to comply with Client's "Business Partner Code of Conduct and Ethics" (available at https://www.carnivalcorp.com/governance/business-conduct-ethics in the "Links" section). In addition, with respect to Supplier's rights and obligations under this Agreement including any past or future relationship with Client and any interaction with any employee of Client, Supplier shall not, and shall cause its personnel not to (i) give or offer to give any gift or benefit to any Client employee, (ii) solicit or accept any services, equipment or commitment, or confidential or proprietary information or data from any Client employee unless such employee is (a) required under a contract between Supplier and Client, (b) made pursuant to a written disclosure agreement between Client and Supplier, or (c) specifically authorized in writing by Client's management, (iii) solicit or accept favoritism from any Client employee, (iv) use any information it receives in connection with its business dealings with Client to sell purchase or trade any stock, security or derivative thereof of Client or Client's parent or affiliated companies, (v) enter into any outside business relationship with any Client employee without full disclosure to, and prior approval of, Client's management. As used herein, "employee" includes members of employee's immediate family and household, "gift or benefit" includes money, goods, services, discounts, favors and the like in any form, but excludes low value advertising items, such as pens, pencils and calendars, and "favoritism" means partiality in promoting the interest of Supplier over that of other suppliers. Notwithstanding anything to the contrary contained herein, in the event of any conflict between the terms and conditions of this Agreement and the Business Partner Code of Conduct and Ethics, the terms of the Business Partner Code of Conduct and Ethics will control.

7.11 **Entire Agreement**. This Agreement supersedes all prior or contemporaneous negotiations, representations or agreements, either written or oral, including bidding documents that are not expressly

- 7 -

incorporated herein, and shall not be varied otherwise than by an instrument of even date herewith or subsequent hereto executed by or on behalf of the Parties.

7.12 **Counterparts**. This Agreement may be executed in any number of counterparts, and by each Party on separate counterparts. Each counterpart is an original, but all counterparts shall together constitute one and the same instrument.

**IN WITNESS WHEREOF** each of the Parties hereto has signed this Agreement as of the date first written above.

**[SIGNATURES APPEAR ON THE FOLLOWING PAGE]**

**WALLTOPIA ADVENTURE USA, LLC:**          **PRINCESS CRUISE LINES, LTD**

By: _____

Name: IVAYLO SOTIROV

Title: CEO

Date: 19 OF June, 2023

By: *Eric Chamberlin*          Eric Chamberlin  Digitally signed by Eric Chamberlin
                                                Date: 2023.06.13 00:38:16 -07'00'

Name: Eric Chamberlin

Title: SVP, Marine and New Build

Date: 13 June 2023



- 9 -

## SCHEDULE A

## SCOPE OF SUPPLY

| Quote: Princess Cruise Ship | | | | |
|---|---|---|---|---|
| Quote Number | 9746 Rev 1 | | | |
| Issued on: | 06/26/2022 | | **WALLTOPIA** | |
| Valid until: | 10/30/2023 | | | |
| Sales Person: | Ivaylo Sotirov | | | |
| Client: | Princess Cruise Ship | | | |

| Design and Engineering (Separate Agreement - For Reference Only) | Quantity | Unit Price | Total | Price in USD |
|---|---|---|---|---|
| 3D Design | 2% | | $ | 21,150 |
| Engineering | 8% | | $ | 84,601 |
| Design & Engineering Paid Invoices 1471, 1472, 1473, 1474 | | | $ | (105,751) |
| **Subtotal:** | | | **$** | **0** |

| Rollglider | Quantity | Unit Price | Total | Price in USD |
|---|---|---|---|---|
| Rollglider track Ø108 mm, HDG painted | 275 | $ 950 | $ | 261,250 |
| Rollglider Line Assembly price Labor Installation | 275 | $ 145 | $ | 39,875 |
| Support Structure for Rollglider (kg) | 27,000 | $ 7.64 | $ | 206,280 |
| Duplex Coating (CS) | 48 | $ 3,000 | $ | 144,000 |
| Electric Rollglider Platform Outdoor | 1 | $ 32,000 | $ | 32,000 |
| Anti-Collision system | 1 | $ 65,000 | $ | 65,000 |
| Anti-Collision system section | 3 | $ 13,437 | $ | 40,310 |
| Electric trolley | 15 | $ 12,800 | $ | 192,000 |
| Electric Battery | 8 | $ 4,000 | $ | 32,000 |
| Service Electric Trolley | 1 | $ 12,800 | $ | 12,800 |
| Battery charging station | 2 | $ 6,000 | $ | 12,000 |
| Harness Set | 10 | $ 700 | $ | 7,000 |
| Excess Pre-fixing Payments Paid under Invoice 1839 | | | $ | (86,870) |
| **Subtotal:** | | | **$** | **957,645** |

| Safety Equipment | Quantity | Unit Price | Total Price in USD |
|---|---|---|---|
| Kids full body harness | 30 | $ 65 | $ 1,950 |
| Adults full body harness | 10 | $ 90 | $ 900 |
| Helmets - Kids | 30 | $ 50 | $ 1,500 |
| Helmets - Adults | 10 | $ 55 | $ 550 |
| Rescue kit Ropes Course | 1 | $ 1,500 | $ 1,500 |
| Ropetopia belay device set | 40 | $ 165 | $ 6,600 |
| **Subtotal:** | | | **$ 13,000** |

| Transport, Accommodation and Installation | Quantity | Unit Price | Total Price in USD |
|---|---|---|---|
| Inland transportation of container(s) | 5 | $ 5,000 | $ 25,000 |
| Technicians- Labor Installation - Fincantien will pay | 6 | $ 8,456 | $ 50,738 |
| Technicians- Labor Installation - Fincantien will pay | 6 | $ 8,456 | ($ 50,738) |
| **Subtotal:** | | | **$ 45,850** |

| **Grand Total:** | | | **$ 1,016,495** |

| Exclusions from the Offer for Rollglider |
|---|
| Ride Station canopy Structure |
| Ship's structural modification to accept the track columns support |
| Airconditioned/covered area for Trolleys and charging station |

| Not included - to be provided by the client | Quantity | Unit Price | Total Price |
|---|---|---|---|
| Areal Lifts for installation | | | Not Included |
| Supervision of Installation | | | Not Included |
| Waste Disposal | | | Not Included |
| Night Installation Labor | | | Not Included |
| Additional Support Structure | | | Not Included |
| Forklifts for Unloading | | | Not Included |
| Cost related to bank warranties, LC and/or similar | | | Not Included |
| Third party certification, apart from TUV | | | Not Included |
| Site visit/3D scan | | | Not Included |
| Local approvals & permits | | | Not Included |
| Approval by Architect/Engineer of record | | | Not Included |
| Foundation drawings and works | | | Not Included |

**Terms & Conditions**

1. All prices are netto without VAT, sales tax, duties or other taxes included, unless explicitly stated otherwise.
2. This quote is subject to the execution of Walltopia standard sales contract.
3. All standard climbing walls require attaching to concrete wall or concrete/steel columns every 6m, anchoring to concrete floor (at least 10cm thickness). Not meeting those requirements will require additional steel structure for reinforcing the standard steel substructure.
4. Approval of structural loads imposed from the climbing wall to the building is at the expense of the customer and not included in Walltopia scope of work.
5. Standard payment terms are 50% - 5 days after signing the contract, 20% - on shipment of Rollglider, 20% on installation, and 10% on commissioning and TUV certification.
6. Standard lead time is 4 months for Europe and 6 months for Asia, America and Australia afterthe 3D design is done, as well as full building drawings and technical questionnaire are provided. Exact production time is confirmed upon date of signing the contract and size of the project.
7. If night only installation is required, this will increase the installation duration and cost.
8. Standard installation assumes using scissor lifts (4.9m operational height) for installing boulders, and boom lifts (operational height same as the height of the climbing wall) for installing rope walls. If this is not possible, installation via scaffolding is required this will increase the installation duration and cost.
9. Client must provide proper access and parking for EuroTruck in front of the building. Unloading on ground level is included in the standard price, but if the installation site is on upper level without big enough lift, this will cost extra for manual unloading of the materials.
10. Warranty is provided on all supplied components and equipment for 2 years from the date of commissioning and TUV certification. Extended warranty and annual inspection is offered upon request.
11. The content of this quote is confidential and intended for the recipient specified at the header of the quote. It is strictly forbidden to share any part of this quote with any third party, without a written consent of Walltopia AD.
12. All content included herein, including, but not limited to, text, graphics, logos, visualizations and photographs, product designs and concepts, is protected by copyright and trademark laws and is owned or managed by Walltopia AD. You may not copy, modify, reproduce, republish, distribute or commercially exploit in any manner the subject content or any part of it without our prior written consent.
13. Supplier will be responsible to pass successfully TUV certification for all of the products supplied by the Supplier. Buyer is responsible to pay all cost associated with TUV certification.

**Offer: Princess Cruise Ship**

| | | |
|---|---|---|
| Quote Number: | 9756 Rev 1 | |
| Issued on: | 06/26/2022 | **WALLTOPIA** |
| Valid until: | 10/30/2023 | |
| Sales person: | Ivaylo Sotirov | |
| Client: | Princess Cruise Ship | |

| Design and Engineering (Separate Agreement - For Reference) | Quantity | Unit Price | Total Price in USD |
|---|---|---|---|
| 3D Design | 2% | | $ 8,022 |
| Engineering | 8% | | $ 32,089 |
| Design & Engineering Paid Invoices 1471, 1472, 1473, 1474 | | | $ (40,112) |
| **Subtotal:** | | | **$ 0** |

| Ropes Course | Quantity | Unit Price | Total Price in USD |
|---|---|---|---|
| Column #273/6 - 9,7m - two levels DUPLEX | 8 | $ 7,000 | $ 56,000 |
| Additional Steel | 1,000 | $ 7.64 | $ 7,640 |
| Beam for obstacle with channel 6m DUPLEX | 8 | $ 1,640 | $ 13,120 |
| Beam for obstacle with channel 5m Duplex | 8 | $ 1,290 | $ 10,320 |
| Premium obstacle 6m RC | 8 | $ 3,425 | $ 27,400 |
| Premium obstacle 5m RC | 8 | $ 2,875 | $ 23,000 |
| Sheet metal platforms DUPLEX | 16 | $ 483 | $ 7,728 |
| Staircase - start DUPLEX | 1 | $ 9,980 | $ 9,980 |
| Start / end platforms DUPLEX | 2 | $ 3,600 | $ 7,200 |
| **Subtotal:** | | | **$ 162,388** |

| Funnel Climbing Structure with Crows Nest | Quantity | Unit Price | Total Price in USD |
|---|---|---|---|
| Crows nest obstacles | 7 | $ 3,000 | $ 21,000 |
| AT Nets | 83 | $ 250 | $ 20,750 |
| Steel mesh net | 380 | $ 145 | $ 55,100 |
| Steel Structure | 7,000 | $ 7.64 | $ 53,480 |
| Tubular Stainless Steel Slide in m | 34 | $ 2,600 | $ 88,400 |
| **Subtotal:** | | | **$ 238,730** |

| Transport, Accommodation and Installation | Quantity | Unit Price | Total Price in USD |
|---|---|---|---|
| Inland Transportation of Containers | 3 | $ 5,000 | $ 15,000 |
| Technicians- Labor Installation; Pincanhen will pay | 4 | $ 6,450 | $ 25,800 |
| Technicians- Labor Installation; Pincanhen will pay | 4 | $ 6,450 | $ (25,800) |
| **Subtotal:** | | | **$ 15,000** |

| Grand Toal: | | | $ 416,118 |
|---|---|---|---|

| Exclusions from the Offer for Funnel Climbing Structure |
|---|
| Crows nest Platform |
| stairways and ADA ramp |
| secondary view platforms and railings |

| Not Included - to be provided by the client | Quantity | Unit Price | Total Price |
|---|---|---|---|
| Areal Lifts for installation | | | Not Included |
| Supervision of Installation | | | Not Included |
| Waste Disposal | | | Not Included |
| Night Installation Labor | | | Not Included |
| Additional Support Structure | | | Not Included |
| Forklifts for Unloading | | | Not Included |
| Cost related to bank warranties, LC and/or similar | | | Not Included |
| Third party certification, apart from TUV | | | Not Included |
| Site visit/3D scan | | | Not Included |
| Local approvals & permits | | | Not Included |
| Approval by Architect/Engineer of record | | | Not Included |
| Foundation drawings and works | | | Not Included |

**Terms & Conditions**

1. All prices are netto without VAT, sales tax, duties or other taxes included, unless explicitly stated otherwise.
2. This quote is subject to the execution of Walltopia standard sales contract.
3. All standard climbing walls require attaching to concrete wall or concrete/steel columns every 6m, anchoring to concrete floor (at least 10cm thickness). Not meeting those requirements will require additional steel structure for reinforcing the standard steel substructure.
4. Approval of structural loads imposed from the climbing wall to the building is at the expense of the customer and not included in Walltopia scope of work.
5. Standard payment terms are 50% - 5 days after signing the contract, 20% - on shipment, 20% on installation, and 10% on commissioning and TUV certification.
6. Standard lead time is 4 months for Europe and 6 months for Asia, America and Australia afterthe 3D design is done, as well as full building drawings and technical questionnaire are the contract and size of the project.
7. If night only installation is required, this will increase the installation duration and cost.
8. Standard installation assumes using scissor lifts (4.9m operational height) for installing boulders, and boom lifts (operational height same as the height of the climbing wall) for installing rope walls. If this is not possible, and installation via scaffolding is required this will increase the installation duration and cost.
9. Client must provide proper access and parking for EuroTruck in front of the building. Unloading on ground level is included in the standard price, but if the installation site is on upper level without big enough lift, this will cost extra for manual unloading of the materials.
10.Warranty is provided on all supplied components and equipment for 2 years from the date of commissioning and TUV certification. Extended warranty and annual inspection is offered upon request.
11. The content of this quote is confidential and intended for the recipient specified at the header of the quote. It is strictly forbidden to share any part of this quote with any third party, without a written consent of Walltopia AD.
12. All content included herein, including, but not limited to, text, graphics, logos, visualizations and photographs, product designs and concepts, is protected by copyright and trademark laws and is owned or managed by Walltopia AD. You may not copy, modify, reproduce, republish, distribute or commercially exploit in any manner the subject content or any part of it without our prior written consent.
13. Supplier will be responsible to pass successfully TUV certification for all of the products supplied by the Supplier. Buyer is responsible to pay all cost associated with TUV certification.

- 10 -

## SCHEDULE B

## CERTAIN DEFINITIONS

"Applicable Standards" means:

 i. EN12572-1:2007 (Artificial climbing structures - Part 1: Safety requirements and test methods for ACW with protection points;

 ii. EN12572-2:2008 (Artificial climbing structures - Part 2: Safety requirements and test methods for bouldering walls);

 iii. EN1991-1-1:2002 (Actions on structures - Part 1-1: General actions - Densities, self-weight, imposed loads for buildings);

 iv. EN1991-1-3:2002 (Actions on structures - Part 1-3: General actions - Snow loads); and

 v. EN1991-1-4:2002 (Actions on structures - Part 1-4: General actions - Wind actions).

 vi. EN13814:2019 (Safety of amusement rides and amusement devices

 vii. Fincantieri document "Roller Glide – Design Criteria for Steel Structures

 viii. Fincantieri document "Vibration Prescriptions for Dynamic Analysis"

 ix. Lloyd's Register Rules and Regulations for the Classification of Ships, where design criteria are shown to be more conservative than the criteria in the EN standards.

"Business Day" means any day other than a Saturday, Sunday, statutory holiday that is observed in the Republic of Bulgaria.

"Deliverables" means the deliverables identified on the Table of Milestones.

"Services" means the design, manufacturing and engineering services to be provided by the Supplier under this Agreement and all labor, materials, supervision, equipment, computers, documents, and all other things necessary for the performance of such services, including and by way of example, not limitation, any and all visual designs, visual elements, graphic design, illustration, animation, and text.

"Payment Schedule" means the plan for payment of the Contract Price as set out in Schedule C.

"prescribed time" means the time for completion of the relevant stage specified in the Design Schedule (as extended in accordance with this Agreement), or if such time is not specified therein, the time reasonably required to complete the relevant milestone.

**SCHEDULE C**

**PAYMENT SCHEDULE**

Set out the relevant details.

The Contract Price shall be paid as follows:

(a)   the amount of **1,432,613 USD** shall be due and payable in accordance with the following:

      a.   50% - 5 days after signing the contract;

      b.   20% - on shipment;

      c.   20% - on installation; and

      d.   10% on commissioning and TUV certification.

- 12 -

## SCHEDULE D

## SUPPLY SCHDULE

The full commissioning and TUV certification is to occur prior to December 31, 2023.

Supply of all material and equipment that requires coordination with the Fincantieri Monfalcone shipyard is to meet the delivery deadlines stipulated in Fincantieri's Owner Supply Schedule for Hull 6310.    The Owner Supply Schedule is a living document; Supplier is permitted to agreed delivery deadlines directly with Fincantieri provided any agreement does not jeopardize the above commissioning and TUV certification deadline.

Additional material and equipment stipulated in the scope of supply and not subject to the Fincantieri Owner Supply Schedule is to be delivered to the Client at the Monfalcone Shipyard prior to December 31, 2023